IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ZACHRY I. PINCKNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. SA-12-CV-00324-DAE |
| | ) | |
| FEDERAL RESERVE BANK OF DALLAS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER: (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT; (2) GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO STRIKE

Before the Court is the Motion for Summary Judgment and the

Motion to Strike brought by Defendant Federal Reserve Bank of Dallas.  After

reviewing the motions and the supporting and opposing memoranda, the Court

**GRANTS** Defendant's Motion for Summary Judgment (Dkt. # 27) and **GRANTS**

**IN PART AND DENIES IN PART** Defendant's Motion to Strike (Dkt. # 31).

BACKGROUND

I.    Pinckney's Employment with the FRB

The Federal Reserve Bank of Dallas (the "FRB") operates a San

Antonio branch that was restructured and substantially downsized in stages.  (Dkt.

1

# 28-1 ("Martin Decl.")  ¶ 6.)  As part of the downsizing, the FRB ceased all cash operations at the San Antonio branch and hired several Law Enforcement Officers for short-term engagements to oversee the wind-down.  (Id.)  To provide these short-term Law Enforcement Officers an incentive to remain with the FRB for the duration of the downsizing, the FRB offered them retention bonuses via a Retention Incentive Agreement.  (Id. ¶ 7.)

In October 2010, the FRB hired Plaintiff Zachry I. Pinckney ("Pinckney") to serve as a short-term Law Enforcement Officer.  (Id. ¶ 5.) Pinckney's job duties included: protecting bank assets; manning security posts; ensuring those entering the FRB premises had proper identification; monitoring the FRB's cameras, alarms, radio, intercom, and telephone; and responding to emergencies.  (Id.)  Pinckney signed a Retention Incentive Agreement pursuant to which the FRB agreed to pay Pinckney a lump sum bonus of $5,706.00 if he remained an employee in good standing through July 31, 2011 or an earlier date designated at the discretion of the FRB.  (Id. ¶ 7; see id. Ex. A.)

During Pinckney's employment, the FRB had in place Equal Employment Opportunity ("EEO") policies prohibiting discrimination on the basis of race, sex, age, religion, national origin, physical or mental disability, and marital status.  (Id. ¶ 8, Ex. B.)  The FRB also had several procedures for reporting alleged

2

unlawful discrimination or harassment.  (Id.)

In addition to its EEO policies, the FRB maintained a Standard Operating Procedure manual ("SOP") for employees in the Law Enforcement Unit where Pinckney worked.  (Id. ¶ 10.)  The SOP contained provisions regarding employee attendance and punctuality, which included a section on "Job Abandonment."  (Id. Ex. C.)  The SOP provided that "Job Abandonment" occurred when an employee was "absent for two or more consecutive scheduled workdays and fail[ed] to notify his/her supervisor of the reason for the absence."[1]  (Id. Ex C § 201.00.)  Employees were warned that "[j]ob abandonment may lead to termination of employment."  (Id.)  A copy of the SOP was provided to Pinckney upon his employment, and he has acknowledged that he read the SOP's section on attendance and punctuality during his employment with the FRB.  (Id. ¶ 10; Dkt. # 28-4 ("Pinckney Dep.") at 102:8–18.)

## II.   Pinckney's Injury and Termination

Shortly after he was hired, on October 25, 2010, Pinckney began the Basic Law Enforcement training course with other Law Enforcement Officer recruits.  (See Dkt. # 28-9 ("Course Schedule").)  This six-week program included

---

[1] The SOP defined an "absence" as "[a]ny time an employee is away from his/her regular scheduled work assignment on leave or without management approval."  (Martin Decl. Ex C.)

semi-automatic pistol training as well as courses in officer survival, tactical

response, and physical control techniques.  (Id.)  According to the FRB, the

program was physically and emotionally demanding because the participants were

required to pass a number of written and practical examinations.  (Dkt. # 27 ¶ 6.)

On November 12, 2010, Pinckney alleges that he injured his knee

during baton training.[2]  (Pinckney Dep. at 81:5–7.)  Immediately following his

injury, he participated in thirteen additional days of physically demanding training.

(Id. at 88:22–89:19; Martin Decl. Ex. 9.)  Pinckney maintains that he continued

working through "intense pain" because he valued his job.  (Dkt. # 30-14

("Pinckney Decl.") ¶ 9.)  He has testified that he had a "visible limp"[3] and that he

was impaired in his ability to walk, stand, lift, run, and kneel.  (Id. ¶¶ 6–7.)

Additionally, he had difficulty sleeping, getting four to six hours of sleep each

night.  (Id. ¶ 10.)

Despite his alleged injury, Pinckney completed his officer training

---

[2]  The FRB reports that, on February 5, 2013, the Texas Department of
Insurance, Division of Workers' Compensation determined that Pinckney did not
sustain a compensable injury on November 12, 2010.  (Dkt. # 27 n.28.)

[3]  To the extent Pinckney testifies that others observed him limp in his
declaration, this statement is not based on personal knowledge as required by
Federal Rule of Evidence 602 and is stricken as requested by the FRB in its Motion
to Strike.  (See Dkt. # 31-1.)

course and began full-time work as a Law Enforcement Officer with the FRB.

More than a month after his initial injury, on Thursday, December 30, 2010,

Sergeant Johnny Sanchez—Pinckney's "shift leader" at the FRB—noticed

Pinckney limping and inquired whether he was feeling well.  (Dkt. # 28-5

("Sanchez Dep.") at 36:12–37:24.)  Pinckney replied that he had a past knee injury

and that his knee was "hurting."  (Id.)  Later that night, Pinckney called Sanchez on

Sanchez's personal cell phone to say that he had just left the doctor's office and

that his doctor advised him to stay home the following workday—Friday,

December 31, 2010.  (Id., Ex. 1; Dkt. # 28-10.)  Pinckney explained that the doctor

believed he had torn the meniscus in his right knee, but that Pinckney was going to

seek a second opinion.  (Pinckney Dep. at 120:9–12.)  Sanchez asked Pinckney to

send him a doctor's note and, to that end, gave Pinckney his personal email

address.  (Sanchez Dep. at 34:18–35:24.)  According to Sanchez, he gave Pinckney

his personal email address because he was not in the office and did not have remote

access to his work email account, but did have immediate access to his private

email account from his smartphone.  (Id.)  Pinckney maintains that he sent the

requested doctor's note to the email address allegedly provided by

Sanchez—jdog@yahoo.com.[4]  (Pinckney Dep. Exs. 13, 17.)  Pinckney's

roommate, Joshua Tannen, claims to have overheard Pinckney having a telephone

conversation where Pinckney confirmed that he should send medical

documentation to the email address jdog@yahoo.com.[5]  (Dkt. 30-15 ¶ 6.)

---

[4]  The FRB objects to Pinckney's declaration statement: "I sent emails with my medical documentations [sic] and restrictions to the address jdog@yahoo.com that Mr. Sanchez provided me over the phone." (Pinckney Decl. ¶ 12.)  The FRB contends this is "speculative, conclusory, and hearsay." (Dkt. # 33-1.)  However, Pinckney has submitted evidence that he did indeed send emails to jdog@yahoo.com.  Pinckney further had personal knowledge of his telephone conversation with Sanchez.  His testimony that Sanchez provided a particular email address is admissible as the admission of a party opponent.  See Fed. R. Evid. 801(d)(2) (providing that a statement "offered against an opposing party and . . . made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay).  Sanchez was acting as an agent of the FRB and within the scope of his employment in supplying Pinckney with an email address to send medical documentation regarding Pinckney's absence at work.

[5]  The FRB objects to the following statement contained in Tannen's declaration: "I heard Mr. Pinckney confirm with [an] individual that the e-mail address Mr. Pinckney was to send the [medical] documents to was jdog@yahoo.com.  I specifically remember this because Mr. Pinckney recited and spelled out the email address." (Dkt. # 31-1.)  This statement is hearsay because it is an out-of-court statement offered to prove the truth of the matter asserted.  See Fed. R. Evid. 801(c).  Nonetheless, it is properly admissible, as Pinckney argues, under the present sense impression exception to the hearsay rule as codified in Federal Rule of Evidence 803(1).  Rule 803(1) provides a hearsay exception for "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."  Fed. R. Evid. 803(1).  In this case, Pinckney, the declarant, was participating in a telephone conversation, which is an "event" under Rule 803(1).  See United States v. Portsmouth Paving Corp., 694 F.2d 312, 323 (4th Cir. 1982) (finding that a telephone call is an "event" for the

According to Sanchez, the email address that he gave Pinckney over the phone was jdog4423@yahoo.com.  (Sanchez Dep. at 47:1–6.)  There is no dispute that Sanchez's correct email address was jdog4423@yahoo.com, and Sanchez never received any emails sent by Pinckney.

On Friday, December 31, 2010, Pinckney sent an email to jdog@yahoo.com with a doctor's note attached.  The note was from Dr. Joseph Paquette and indicated that Pinckney could return to work on Monday, January 3, 2011.  (Dkt. # 30-4.)  The note also provided that Pinckney was placed on "modified duty" for two weeks with "[l]imited walking, [n]o running, [n]o ladders" and could "return to full duty" on January 15, 2011 or sooner.  (Id.)  Neither Sanchez nor any other FRB employee received this email.

On Friday morning, Sanchez emailed his supervisor Captain Edwin Lipinski ("Lipinski") to inform him that Pinckney had been advised by his doctor

---

purposes of Rule 803(1) and that statements describing a telephone conversation made immediately after the call fall within the present sense impression exception). In the statement at issue here, Pinckney was describing his perception of the substance of the telephone conversation—namely, his impression of the email address Sanchez had just provided him.  Additionally, the FRB's objection that Tannen could not hear Sanchez's side of the conversation falls short.  What matters is that the declarant personally observed the event in question.  See United States v. Mitchell, 145 F.3d 572, 575 (3d Cir. 1998) ("The declarant must have personally perceived the event described.") (emphasis added).  Moreover, Tannen laid a sufficient foundation of personal knowledge because he lived with Pinckney and testified to overhearing the telephone conversation.

to stay home due to a possible torn meniscus, but that Sanchez had not received medical documentation from Pinckney as requested.  (Dkt. # 30-7; Sanchez Dep. at 47:1–6.)  Because Pinckney had not communicated with any FRB employee that morning, Lipinski called Pinckney in the afternoon.  (Dkt. # 28-6 ("Lipinski Dep.") at 69:18-21.)  He was unable to reach Pinckney and, therefore, left a message.  (Id.) According to Pinckney, he returned Lipinski's call within a few minutes and left a message on Lipinski's phone.  (Pinckney Dep. at 165:23–166:2.)

On Saturday, January 1, 2011, Pinckney went to the Emergency Room to have his knee examined.  (Dkt. # 30-5.)  Dr. Tri Dang examined his knee and instructed Pinckney to "stay off the right lower extremity" and to attend a follow-up appointment.  (Id.)  Pinckney obtained a "Work Release" from Dr. Dang indicating a return to work date of Monday, January 4, 2011.  (Id.)

On Sunday, January 2, 2011, Pinckney again called Sanchez on Sanchez's personal cell phone and advised Sanchez that he would not be at work the following day.  (Sanchez Dep. at 64:18–65:2; Dkt. # 30-9.)  When Sanchez inquired whether Pinckney's knee required surgery, Pinckney replied that he would find out at his doctor's appointment the next day.  (Dkt. # 30-9.)  During the call, Sanchez informed Pinckney that he never received Pinckney's medical documentation and again requested that Pinckney send it via email.  (Sanchez Dep.

8

at 55:8–13.)  Sanchez also emailed his supervisor Lipinski to apprise him of
Pinckney's situation.  (Dkt. # 30-9.)

On Monday, January 3, 2011, Pinckney emailed the doctor's note he
had obtained from the emergency room the previous Saturday to jdog@yahoo.com.
He also visited Dr. John A. Evans, who examined Pinckney's knee.  (Dkt. # 30-6.)
Pinckney obtained a Return to Work Certificate from Dr. Evans indicating that he
could return to work on January 9, 2011[6] with the restrictions of "light duty, no
running, sedentary work only until next app[ointment] on 01/13/2011."  (Id.)  It
was not until two days later, on January 5, 2011, that Pinckney emailed this
doctor's note to jdog@yahoo.com.  (Id.)

Pinckney did not attend work on Tuesday, January 4, 2011 and
provided no notification regarding his absence to anyone at the FRB.  (See
Pinckney Dep. at 173:21–174:4; Dkt. # 28-2 ("Walker Decl.") ¶ 5.)  Later that day,
Lieutenant Richard Walker called Pinckney and received a message that

---

[6]  A copy of the doctor's note from Dr. Evan's office indicates a return to
work date of January 4, 2011, not January 9, 2011.  At his deposition, Pinckney
stated that he obtained a second note with the date of January 9, 2011 from Dr.
Evan's office, which was emailed to him by a nurse.  (Pinckney Dep. at 151:18–
152:11).  Pinckney agreed with counsel for the FRB that there is no record of any
such email in Pinckney's inbox.  (Id. at 154:8–155:8.)

Pinckney's phone was out of service.  (Walker Decl. ¶ 5.)  The FRB's telephone

records reflect that Pinckney never returned Walker's call.  (Id. Ex. B, Ex. 7.)

On Wednesday, January 5, 2011, Pinckney again did not attend work.

Pinckney emailed jdog@yahoo.com, stating that he had an MRI scheduled the

following day and would be able to return to work by January 9th, "hopefully

sooner."  (Dkt. # 30-6.)  According to Sanchez, Lipinski, and Walker, they did not

receive any communication from Pinckney on January 5, 2011.  (See Walker Decl.

¶ 6; Sanchez Dep. at 65:3–7; Lipinski Dep. at 70:15–19.)  According to Pinckney,

he had a missed call and voicemail from Lipinski that day.  (Pinckney Dep. at

166:12–24.)  Pinckney maintains that he returned Lipinski's call within a few

minutes.  (Id. at 166:18–21.)  He allegedly left a voicemail on Lipinski's phone

stating that he was sorry to have missed Lipinski's call, but that his medication

caused him to fall asleep and that he "would be able to come back to work

[January] 9th as scheduled."[7]  (Id. at 167:5–6.)  The FRB's phone records and

---

[7] The FRB objects to the following statements contained in Tannen's
declaration: "I also specifically remember overhearing a conversation in January
2011 in which Mr. Pinckney left an individual named Lipinski a voicemail.  Mr.
Pinckney explained that he missed Lipinski's call because he fell asleep, that Mr.
Pinckney would return to work that Monday, and if there were any questions to
call Mr. Pinckney back."  (Dkt. # 31-1.)  The FRB contends that these statements
constitute inadmissable hearsay.

Federal Rule of Evidence 801(c) defines hearsay as a statement that:
"(1) the declarant does not make while testifying at the current trial or hearing; and

Lipinski's cell phone records do not reflect an incoming call from Pinckney's

phone number on January 5, 2011.  (Id. Ex. 27.)

On Thursday, January 6, 2011, Lipinski contacted Donnie Martin, the

FRB Human Resources Manager in San Antonio, to determine the proper process

for terminating Pinckney's employment.  (Martin Decl. ¶ 11.)  Martin advised

Lipinski of the SOP policy on job abandonment; namely, that an employee who is

"absent for two or more consecutive workdays" without notice is deemed to have

"abandoned" his employment.  (See id.)  Based on Lipinski's information that

Pinckney had been absent from work since January 4th without any

communication, Martin approved the decision to consider Pinckney as having

abandoned the job.  (Id.)  The following day, on January 7, 2011, Pinckney's

employment with the FRB was terminated.  (Id.)

_____

(2) a party offers in evidence to prove the truth of the matter asserted in the
statement."  Fed. R. Evid. 801(c).  Thus, not every out-of-court statement is
hearsay.  "If the significance of an offered statement lies solely in the fact that it
was made, no issue is raised as to the truth of anything asserted, and the statement
is not hearsay."  Fed. R. Evid. 801(c) advisory committee's note; see United States
v. Cantu, 876 F.2d 1134, 1137 (5th Cir. 1989).  In this case, to the extent the
contested statements are offered to prove Pinckney left a such a voicemail for an
individual named Lipinski "sometime" in January 2011, they are not hearsay and
therefore admissible.  Moreover, Tannen laid a sufficient foundation of personal
knowledge because he lived with Pinckney and testified to overhearing the
statements at issue.

Three days after his termination, on January 10, 2011, Pinckney returned to the FRB at 8:46 am.  (Walker Decl. ¶ 7; Pinckney Dep. at 173:21–174:4.)  According to Walker, Pinckney appeared significantly late for what would have been his shift and in plain clothes instead of his uniform.  (Walker Decl. ¶ 7.)  Walker met Pinckney at the door and informed him that his employment with the FRB had been terminated due to job abandonment.  (Id. ¶ 8; Pinckney Dep. 174:10–18.)  According to Pinckney, he informed Walker that he had sent Sanchez the appropriate medical documentation for his absences and asked to speak with a Human Resources representative.  (Pinckney Dep. at 174:19–22.)  Pinckney waited for thirty to forty-five minutes, but was informed that no staff member in the Human Resources department wished to speak with him.  (Id. at 174:23–175:2.)

On February 4, 2011, the FRB's third-party benefits administrator, Aaron Hewitt, sent notice of Pinckney's termination to SHPS, a third-party vendor responsible for creating COBRA paperwork and mailing it to the individual who experienced the COBRA-qualifying event.  (Dkt. # 28-3 ("Pleasant Decl.") ¶¶ 4–7.)  SHPS promptly sent Pinckney's COBRA paperwork via certified mail to Pinckney's correct address on February 10, 2011.  (Id. ¶¶ 5, 9.)  Pinckney claims that he never received the paperwork.  (Dkt. # 1 ("Compl.") ¶¶ 46–47.)

III.    <u>Pinckney's Medical and Employment History After Termination</u>

Pinckney's medical records indicate that he had surgery on the meniscus in his right knee on February 3, 2011.  (Pinckney Dep., Ex. 25.) According to Pinckney, he was confined to crutches for three to six weeks following surgery and only slept three hours per night when not on medication. (Dkt. # 30-14 ¶ 19.)  He was "totally released" by his doctor in April 2011, four months after first missing work due to alleged knee pain.  (Pinckney Dep. at 113:4–6.)  His doctor did not place any restrictions or physical limitations on him after his release.  (<u>Id.</u> at 113:4–14.)  Nonetheless, Pinckney maintains that he was not able "to fully go up and down stairs without making adjustments" until eight months after his injury.[8]  (Dkt. # 30-14 ¶ 20.)

Since the termination of his employment with the FRB, Pinckney has worked for Global Security Solutions as a uniformed, armed security guard.  (<u>Id.</u> at 54:5–55:5.)  In performing this job, Pinckney stands for hours without access to a

---

[8]  The FRB objects that this declaration statement is inconsistent with Pinckney's previous deposition testimony that he only had problems "not going up stairs, but coming down, my knee would buckle under me."  (Dkt. # 31; <u>see</u> <u>also</u> Pinckney Dep. 113:18–19.)  It is "well settled" that a party may not "defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony."  <u>S.W.S. Erectors v. Infax, Inc.</u>, 72 F.3d 489, 495 (5th Cir. 1996).  While the Court acknowledges the inconsistency of the declaration statement, the FRB has not explained how this inconsistency has been used to create a genuine issue of material fact.  The objection is overruled.

chair or podium.  (Id. at 55:3–57:17.)  He is also required to walk up and down stairs, which he is able to do without any assistance.  (Id. at 57:25–58:7.)  Pinckney has also performed lane closures for the Department of Transportation (id. at 59:5–15) and provided services at the Security Public Safety Training Institute (id. at 61:7–9).  Pinckney performed all of these physically demanding jobs without requesting any accommodations.  (Id. at 74:14–17.)

IV.    Procedural History

On April 10, 2012, Pinckney filed suit against the FRB, alleging that the FRB discriminated against him in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.  (Compl. ¶¶ 51–60.)  More specifically, he contends that his knee injury constitutes a "disability" under the ADA and that the FRB failed to accommodate his disability and unlawfully terminated his employment on account of his disability.  (Id.)  Pinckney also alleges that the FRB violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., by failing to provide adequate and timely notice of his right to continuing medical benefits under COBRA.  (Id. ¶¶ 61–62.)

On February 15, 2013, the FRB filed a Motion for Summary Judgment.  (Dkt. # 27.)  Soon thereafter, Pinckney filed a response in opposition to

the motion.  (Dkt. # 30.)  On March 15, 2013, the FRB filed a Motion to Strike

certain evidence offered in Pinckney's response to the FRB's Motion for Summary

Judgment.  (Dkt. # 31.)  It also filed a reply in support of its Motion for Summary

Judgment.  (Dkt. # 32.)  On March 27, 2013, Pinckney filed a response in

opposition to the FRB's Motion to Strike.  (Dkt. # 33.)

STANDARD OF REVIEW

Summary judgment is granted under Federal Rule of Civil Procedure

56 when "the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

see also Cannata v. Catholic Diocese of Austin, 700 F.3d 169, 172 (5th Cir. 2012).

The main purpose of summary judgment is to dispose of factually unsupported

claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

The moving party bears the initial burden of demonstrating the

absence of any genuine issue of material fact.  Id. at 323.  If the moving party meets

this burden, the non-moving party must come forward with specific facts that

establish the existence of a genuine issue for trial.  ACE Am. Ins. Co. v. Freeport

Welding & Fabricating, Inc., 699 F.3d 832, 839 (5th Cir. 2012).  In deciding

whether a fact issue has been created, "the court must draw all reasonable

inferences in favor of the nonmoving party, and it may not make credibility

15

determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." <u>Brown v. City of Hous.</u>, 337 F.3d 539, 541 (5th Cir. 2003).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

<u>DISCUSSION</u>

The FRB argues that it is entitled to summary judgment because Pinckney has failed to make a prima facie case of disability discrimination and, in any event, has not demonstrated that the FRB's stated reason for firing Pinckney was mere pretext.  The FRB also contends that it complied with the notice provisions of COBRA by mailing the appropriate information to Pinckney's last known address ten days earlier than required by law.  For the reasons given below, Pinckney fails to raise a genuine issue of material fact with respect to his claims, and the FRB is entitled to judgment as a matter of law.

I.      Unlawful Termination Claim

The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

Where, as here, only circumstantial evidence is offered to show alleged unlawful employment discrimination under the ADA, courts apply the Title VII burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See McInnis v. Alamo Cmty. Coll. Dist., 207 F.3d 276, 279–80 (5th Cir. 2000).  Under that framework, a plaintiff must establish a prima facie case of disability discrimination by showing:

> (1) He is disabled or is regarded as disabled; (2) he is qualified for the job; (3) he was subjected to an adverse employment action on account of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees.

Id.  Once the plaintiff makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Id.  If the employer provides such a reason, the burden shifts

back to the plaintiff to establish that the articulated reason was merely a pretext.
Id.

    A.    <u>Whether Pinckney Was Disabled</u>

To satisfy the first prima facie element of his disability discrimination claim for wrongful termination, Pinckney must establish that he suffered from a qualifying disability.  To qualify as disabled under the ADA, a plaintiff must prove one of the following: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  Whether a person has a disability under the ADA is an "individualized inquiry."  <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 483 (1999) (overruled by statute on other grounds).

    i.    <u>Actual Disability</u>

To establish disability under the first prong of 42 U.S.C. § 12102(1), a plaintiff must demonstrate that he or she had an "impairment," that a "major life activity" was limited by the impairment, and that the impairment "substantially limited" that major life activity.  <u>Butler v. Exxon Mobil Corp.</u>, 838 F. Supp. 2d 473, 486 (M.D. La. 2012) (citing <u>Waldrip v. Gen. Elec. Co.</u>, 325 F.3d 652, 654

(5th Cir. 2003)).  "[M]ajor life activities include, but are not limited to . . .

sleeping, walking, standing, lifting, bending . . . concentrating, thinking,

communicating, and working."  42 U.S.C. § 12102(2)(A).  Whether an impairment

substantially limits a major life activity is to be determined "without regard to the

ameliorative effects of mitigating measures," such as medication, equipment,

prosthetics, and other assistive technology.  Id. § 12102(4)(E)(I).  Furthermore,

"[a]n impairment need not prevent, or significantly or severely restrict, the

individual from performing a major life activity in order to be considered

substantially limiting."  29 C.F.R. § 1630.2(j)(1)(ii).  Rather, an impairment is a

disability if it substantially limits the individual's ability to perform major life

activities compared to most people in the general population.  Id.

      Here, Pinckney contends that his knee injury constituted a disability

under the ADA because it "substantially limited" several major life activities,

including "walking, standing, bending, sleeping and performing manual tasks."

(Dkt. # 30 at 11.)  A knee injury is doubtless a "physical impairment" within the

meaning of the statutory language of the ADA.  See 29 CFR § 1630.2(h)(1)

("Physical . . . impairment means . . . [a]ny physiological disorder or condition . . .

affecting one or more body systems.").  However, prior to December 30, 2010,

there is simply no evidence that Pinckney was "substantially limited" in any major

19

life activity.  Pinckney was able to participate in <u>thirteen days</u> of physically demanding training immediately following the date of his alleged injury.  Although he maintains that he worked through pain, Pinckney was able to successfully complete the training without requesting a modification or reporting an injury. Moreover, Pinckney continued working at his physically demanding job for <u>more than a month</u> after the alleged injury took place.  Thus, he was not "disabled" under the ADA definition of that term prior to December 30, 2010.

However, by December 30, 2010, Pinckney's knee injury had worsened to the point that he needed to see a doctor.  Although the extent of his injury was unclear when he first saw Dr. Paquette on December 30, 2010, he was diagnosed with a possible torn meniscus and placed on "modified duty" for two weeks with limited walking, no running, and "no ladders."  (Dkt. # 30-4.) Additionally, several days later, Dr. Evans indicated that Pinckney could return to work with the restrictions of "light duty, no running, sedentary work only until next app[ointment] on 01/13/2011."  (Dkt. # 30-6.)  Thus, at the time of his termination, there is evidence that Pinckney was impaired in his ability to walk and stand, which each constitute a "major life activity" under the statutory definition of that term.  Pinckney's knee injury ultimately required surgery, which took place on February 3, 2011.  (Pinckney Dep. Ex. 25.)  According to Pinckney, he was

confined to crutches for three weeks following surgery and only slept three hours per night when not on medication.  (Dkt. # 30-14 ¶ 19.)  He was "totally released" by his doctor in April 2011, four months after he first missed work due to alleged knee pain.  (Pinckney Dep. 113:4–6.)  However, the Court notes that there is no evidence in the record of Pinckney's medical condition during the period between his surgery and his January 3, 2011 appointment with Dr. Evans.

The FRB contends that Pinckney's injury was not of sufficient severity to have "substantially limited" any major life activity.  Before Congress passed the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110–325, 122 Stat. 3553 (Sept. 25, 2008), the Supreme Court had held that the term "substantially limits" was to be "interpreted strictly to create a demanding standard for qualifying as disabled," and that an impairment had to "prevent[ ] or severely restrict[ ] the individual" from engaging in a major life activity.  See Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197–98 (2002).  As amended, the ADA now provides that the definition of disability "shall be construed in favor of broad coverage."  42 U.S.C. § 12102(4)(A).  New regulations enacted after the passage of the ADAAA also provide that "substantially limits" is "not meant to be a demanding standard," although "[n]ot every impairment will constitute a disability

within the meaning of this section [of the ADA]."  29 C.F.R. § 1630.2(j)(1)(i)–(ii).

One court has explained:

> [T]he ADAAA was adopted to specifically address certain
> impairments that were not receiving the protection that Congress
> intended—cancer, HIV-AIDS, epilepsy, diabetes, multiple sclerosis,
> amputated and partially amputated limbs, post-traumatic stress
> disorder, intellectual and developmental disabilities—not minor,
> transitory impairments, except if of such a severe nature that one
> could not avoid considering them disabilities.

Koller v. Riley Riper Hollin & Colagreco, 850 F. Supp. 2d 502, 513 (E.D. Pa.

2012) (citing 154 Cong. Rec. H8286 (2008) (statement of Rep. George Miller)).

While the limitation imposed by a qualifying impairment need no longer

"significantly" or "severely" restrict a plaintiff's ability to perform a major life

activity, the limitation must nonetheless be "important."  See id. (citing 29 C.F.R.

pt. 1630 App. (2011)).

        The FRB argues that Pinckney's knee injury is analogous to the

plaintiff's anterior cruciate ligament ("ACL") tear in Koller v. Riley Riper Hollin

& Colagreco.  See id. at 513.  In Koller, the plaintiff had surgery on his ACL and

claimed that, for two weeks following the surgery, he was in pain, heavily

medicated, and had trouble staying awake and concentrating.  Further, he had

"difficulty moving and driving because of the cast on his knee to reduce

movement."  Id. at 513–14.  Despite these difficulties, the Koller court held that,

22

based on the facts as plead, the plaintiff's torn ACL did not qualify as a disability, even under the more generous standards promulgated by the ADAAA.  Id. at 514–515.

Here, the Court need not decide whether Pinckney was "disabled" under the ADA as of December 30, 2010 because his claim for wrongful termination fails on other grounds.  Thus, for the purposes of this Order, the Court assumes without deciding that Pinckney is disabled under the ADA.  See 29 C.F.R. § 1630.1(c)(4) ("The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability.").

ii.   Regarded as Disabled

A plaintiff whose impairment does not substantially limit any major life activities may nevertheless bring suit under the ADA if he is "regarded as having such an impairment."  42 U.S.C. § 12102(1)(C).  Until the passage of the ADAAA, a plaintiff could establish he was "regarded as" disabled in this circuit if he could show that: "(1) a covered entity mistakenly believes that [he] has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment

23

substantially limits one or more [of his] major life activities." <u>Kemp v. Holder</u>, 610 F.3d 231, 237 (5th Cir. 2010) (quoting <u>Sutton</u>, 527 U.S. at 489, <u>superseded by</u> Pub.L. No. 110–325 (2008)).  This test required the plaintiff to "demonstrate that the employer actually 'entertain[ed] misperceptions about the individual . . .'" <u>Id.</u> (quoting <u>Sutton</u>, 527 U.S. at 489).

   The ADAAA makes clear that the "regarded as" disabled prong no longer requires a showing that the employer perceived the individual to be substantially limited in a major life activity.  <u>See</u> 42 U.S.C. § 12102(3)(A) ("An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment <u>whether or not the impairment limits or is perceived to limit a major life activity</u>.") (emphasis added); <u>Brown v. City of Jacksonville</u>, 711 F.3d 883, 889 (8th Cir. 2013).  However, an individual may not be "regarded as" disabled if the impairment was "transitory and minor." <u>Id.</u>  A transitory impairment is an impairment with an actual or expected duration of 6 months or less.  <u>Id.</u>

   In this case, the FRB argues that Pinckney's injury was "transitory and minor."  There can be no dispute that Pinckney's injury was "transitory" because he was fully released by his doctor in April 2011—a mere four months

after he first missed work due to his knee injury.  However, as discussed above, the Court assumes without deciding that Pinckney's injury was not "minor" and, accordingly, now assumes without deciding that Pinckney was "regarded as" disabled.

      B.    <u>Whether Pinckney Was Qualified for the Position</u>

The second prima facie element Pinckney must establish is that he was "qualified for the job."  <u>See</u> <u>McInnis</u>, 207 F.3d at 279.  "A qualified individual with a disability, under the ADA, is one who 'with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"  <u>E.E.O.C. v. Chevron Phillips Chemical Co.</u>, LP, 570 F.3d 606, 615 n.7 (5th Cir. 2009) (quoting 42 U.S.C. § 12111(8)).

Here, the FRB argues that Pinckney was not "qualified for the job" because he failed to comply with the punctuality and attendance requirements of his post.  (<u>See</u> Dkt. # 27 at 17.)  The Fifth Circuit has held that "regular attendance is an essential function of most jobs."  <u>Hypes ex rel. Hypes v. First Commerce Corp.</u>, 134 F.3d 721, 727 (5th Cir. 1998); <u>accord</u> <u>Vandenbroek v. PSEG Power CT LLC</u>, 356 F. App'x. 457, 460 (2d Cir. 2009) (holding that an employee who violated the company's "no call/no show" policy was not "qualified" because

reliable attendance was especially important to the plaintiff's job where employees had to be present to monitor a boiler and respond to alarms).

The FRB requires its law enforcement personnel to be punctual and to have regular attendance as set forth in § 201.00 of the Standard Operating Procedure manual ("SOP") in the section regarding "Attendance and Punctuality." (Martin Decl. Ex. C.)  The SOP provides that "[t]he successful and efficient functioning of the Law Enforcement Unit is dependant upon the regular attendance of all [the FRB's] employees."  (Id.)  Attendance and punctuality are critical to the successful functioning of the Law Enforcement Unit because the FRB relies upon Law Enforcement Officers like Pinckney to be physically present at the FRB to ensure the safety of the FRB's operations, employees, and patrons.  The importance of the FRB's attendance policy is underscored by the SOP's provision on "Job Abandonment."  (Id.)  Pursuant to that section, an employee that is absent for two or more consecutive scheduled workdays and fails to notify his supervisor of the reason for the absence is deemed to have abandoned his post.  (Id.)  The SOP further warns that job abandonment "may lead to termination of employment."  (Id.)

Pinckney acknowledged at his deposition that he never obtained the approval of a supervisor to take leave from January 4, 2011 through January 9,

2011.  (Pinckney Dep. at 168:2–3.)  In fact, he never actually spoke to an FRB

employee during that period.  The last time that an FRB employee heard from

Pinckney was when Pinckney placed his second phone call to Sanchez on Sunday,

January 2, 2011.  In that conversation, Pinckney only asked for the following day

off of work due to a doctor's appointment.  There is no dispute that neither

Sanchez nor any other FRB employee received Pinckney's January 5, 2011 email

indicating that, per his doctor's instructions, Pinckney would miss work until

January 9, 2011.  The only other communication with the FRB that Pinckney

claims to have made from the period between January 4, 2011 and January 9, 2011

was a voicemail that he allegedly left for Lipinski on January 5, 2011.  However,

there is no evidence that the FRB ever received this call; there is no record of an

incoming call from Pinckney's phone number on January 5, 2011 in either the

FRB's phone records or Lipinski's cell phone records, despite the fact that

previous calls from Pinckney's phone number appear in those same records.

Pinckney acknowledged that the only other phone he might have used to call the

FRB was his roommate's phone, and there was no record of a call from his

roommate's phone number.  (Id. at 190:1–12.)  Lipinski himself testified that he

received no communication from Pinckney on January 5, 2011.  Moreover, even

assuming that Lipinski received the voicemail from Pinckney, Pinckney merely

27

informed Lipinski that he was sorry to have missed Lipinski's call and that he would return to work on January 9, 2011 "as scheduled."  (Id. at 166:12–24.) Thus, the message did not actually inform Lipinski, one of Pinckney's supervisors, of the reason for his absence as required by the SOP.

In sum, there is no evidence that the FRB ever received any communication from Pinckney regarding the reason for his absences from work between January 4, 2011 and January 9, 2011.  Thus, the FRB appropriately determined that Pinckney had abandoned his job under the terms of the SOP manual.  Because Pinckney did not meet the punctuality and attendance requirements of his position, he was not "qualified for the job" and has failed to establish the second prima facie element of disability discrimination.

C.     Whether Pinckney Was Subjected to an Adverse Employment Action on the Basis of His Alleged Disability

The third prima facie element Pinckney must establish is that "he was subjected to an adverse employment action on account of his disability."  See McInnis, 207 F.3d at 279–80.  The ADA prohibits discrimination "the basis of disability" with respect to the terms, conditions, and privileges of employment.  42 U.S.C. § 12112(a).  To make this showing of causation, the plaintiff need not show that discrimination is "the sole reason for the adverse employment decision," but

that it "actually play[ed] a role in the employer's decision making process and

ha[d] a determinative influence on the outcome."  Pinkerton v. Spellings, 529 F.3d

513, 519 (5th Cir. 2008) (citation omitted) (internal quotation marks omitted).

Here, the FRB argues that the causal link between Pinckney's

disability and his termination is broken because the FRB had no knowledge of

Pinckney's disability.  "[A]n employer cannot fire an employee 'because of' a

disability unless it knows of the disability."  Hedberg v. Indiana Bell Tel. Co., Inc.,

47 F.3d 928, 932 (7th Cir. 1995); accord Adeleke v. Dallas Area Rapid Transit,

487 F. App'x 901, 903 (5th Cir. 2012); Dooley v. Parks & Recreation for Parish of

E. Baton Rouge, 433 F. App'x 321, 326 (5th Cir. 2011).

The evidence shows that the FRB had no knowledge Pinckney was

actually disabled.[9]  Pinckney never reported his November 12, 2010 knee injury to

---

[9]  The Court notes that the very definition of a qualifying "disability" under
the "regarded as" disabled prong of 42 U.S.C. § 12102(1) contains causal
language.  See 42 U.S.C. § 12102(3)(A) (stating that an individual is "regarded as"
disabled if she establishes that she "has been subjected to an action prohibited
under this chapter because of an actual or perceived physical or mental impairment
. . .") (emphasis added).  Thus, the third prima facie element of disability
discrimination appears to be subsumed into the definition of "regarded as"
disabled.  Here, the FRB's awareness that Pinckney had sustained a knee injury is
sufficient to impart knowledge of Pinckney's impairment for the purposes of the
"regarded as" disabled prong.  Additionally, the very close proximity in time
between when the FRB first learned of Pinckney's impairment and Pinckney's
termination—approximately one week—is sufficient to satisfy a prima facie
showing of causation.  See Evans v. City of Houston, 246 F.3d 344 (5th Cir. 2005)

the FRB or requested any special accommodation following that injury.  More than

a month after his injury, when Sanchez observed him limping, Pinckney merely

informed Sanchez that he had sustained knee injury in the past and that his knee

was "hurting."  (Sanchez Dep. at 36:12–37:24.)  After a call from Pinckney later

that night, Sanchez learned that Pinckney's doctor had advised him to stay home

the next day and that he had a possible torn meniscus, but that Pinckney was going

to seek a second opinion.  The second phone call Pinckney made to Sanchez was to

inform Sanchez that he would miss work the following day due to a doctor's

appointment and that he was uncertain whether his knee required surgery.  Beyond

these two phone calls to Sanchez, the FRB received no further communication

from Pinckney regarding his absences or the nature of his injury.  Although

Pinckney sent several emails with doctor's notes to jdog@yahoo.com, no FRB

employee received these emails.

   In sum, the FRB had no reason to know of the severity or the extent of

Pinckney's injury.  Because the FRB never received any doctor's notes or any

other medical documentation from Pinckney, the FRB had no knowledge of what

---

(finding a five-day lapse between an employee's protected activity and an adverse
employment action sufficient to satisfy the "causal link" prong of a prima facie
retaliation claim, without any other evidence of a causal link).  Thus, Pinckney has
adequately established the third prima facie element for the purposes of the
"regarded as" disabled prong of 42 U.S.C. § 12102(1).

type of physical limitations Pinckney's injury had imposed upon him.  The FRB

simply had no means to ascertain that Pinckney was suffering from an impairment

rising to the level of a disability.  Moreover, the FRB was not under any obligation

to speculate as to the nature of Pinckney's injury.  Indeed, such a rule would

require employers to "don white coats and diagnose (correctly, no less) employees

having any potentially health-related difficulties at work."  Howard v. Steris Corp.,

886 F. Supp. 2d 1279, 1292–93 (M.D. Ala. 2012).

   The FRB could not have terminated Pinckney's employment on the

basis of a disability that it did not know existed.  Pinckney has, accordingly, failed

to establish this prima facie element of his discrimination claim under the ADA.

  D. Whether Pinckney Was Replaced By, or Treated Less Favorably
    Than, Non-Disabled Employees

   The fourth prima facie element Pinckney must establish is that he was

"replaced by or treated less favorably than non-disabled employees."  See McInnis,

207 F.3d at 279–80.  Pinckney has not identified a single similarly-situated, non-

disabled employee who was treated more favorably than he by the FRB.  He does,

however, generally contend that other unspecified Law Enforcement Officers had

the opportunity to apply for full-time positions with the FRB after their short-term

positions ended.  However, these employees were only given this opportunity after

31

they completed their short-term assignments.  Pinckney was not "similarly-situated" because he never completed his short-term assignment with the FRB.  Moreover, there is no evidence in the summary judgment record of examples of any such individuals.

Pinckney also asserts that non-disabled individuals replaced him.  However, the FRB did not replace Pinckney because his employment was short-term and scheduled to end by July 2011, at the latest.  Thus, Pinckney has failed to present any evidence to establish this prima facie element of his ADA claim.

E.    <u>Pretext</u>

Even assuming Pinckney established a prima facie case of discrimination, the FRB has presented a legitimate, non-discriminatory reason for terminating Pinckney's employment, and Pinckney has not met the burden of establishing by a preponderance of the evidence that the articulated reason was merely a pretext.

First, the FRB has articulated a legitimate, non-discriminatory reason for terminating Pinckney's employment.  Pinckney never notified or obtained the approval of a supervisor for leave from January 4, 2011 through January 9, 2011.  As described above, the SOP manual for FRB employees provides that an

employee may be terminated due to "Job Abandonment" if an employee is absent two or more consecutive work days without informing a supervisor.  Because the FRB never received any communication from Pinckney regarding his absences from January 4, 2011 through January 9, 2011, it appropriately determined that Pinckney had abandoned his job under the terms of the SOP manual.  Thus, the FRB had a legitimate, non-discriminatory reason to terminate Pinckney's employment.

Second, Pinckney has failed to establish pretext in this case.  To establish pretext, a plaintiff "must put forward evidence rebutting each of the non-discriminatory reasons the employer articulates."  Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 220 (5th Cir. 2001).  "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence."  Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003) (citation omitted) (internal quotation marks omitted).  However, in attempting to establish pretext, a plaintiff cannot solely rely on his subjective belief that discrimination has occurred.  Price v. Marathon Cheese Corp., 119 F.3d 330, 337 (5th Cir. 1997).

In this case, Pinckney argues that the FRB's explanation that his employment was terminated due to "job abandonment" is false or unworthy of

credence.  Pinckney maintains that he was in "constant communication" with the FRB.  (Dkt. # 30.)  However, this argument fails because, as discussed at length above, Pinckney did not notify a supervisor of the reason for his absences for a period of longer than two days—namely, from January 4, 2011 through January 9, 2011—in violation of the attendance requirements set forth in the SOP.

Pinckney next points out that the reason the FRB lists in its computer database for Pinckney's termination is not "Job Abandonment," but rather "Job Dissatisfaction."  (Dkt. # 30.)  However, Pinckney offers no evidence as to the source of this coding or when it was entered in the database.  Moreover, the term "job dissatisfaction" is not inconsistent with the concept of "job abandonment." This evidence is simply insufficient to sustain an inference that the FRB's cited reason for Pinckney's termination was pretextual.

Pinckney also argues that Sanchez intentionally gave him a "false email address."  (Dkt. # 30.)  However, this allegation is entirely speculative and is not corroborated by any evidence in the record.  Without more, it is insufficient to show the FRB's proffered reason for Pinckney's termination was mere pretext. See Brown, 337 F.3d at 541 ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary

judgment.").  Pinckney admits that nether Sanchez nor any other FRB employee ever spoke negatively about his knee injury.  (Pinckney Dep. at 181:12–182:3). Moreover, Sanchez had no authority to fire Pinckney and took no part in the decision to ultimately terminate Pinckney's employment.  Lipinski, the FRB employee who did possess such decision-making authority, did not rely solely upon a lack of email communication in making the decision to terminate Pinckney's employment; Lipinski and Walker both attempted to contact Pinckney directly by telephone, all to no avail.

Finally, Pinckney contends that the FRB has exhibited bias against injured workers because it does not have "light duty accommodations" and because Lipinski was allegedly disciplined for an injury that he sustained.  (Dkt. # 30.) However, neither of these assertions are supported by the record.  Lipinski testified in his deposition that the FRB does not have a "limited work duty status," but further elaborated that when limited or modified duty is requested by an employee, "each case is different" and the FRB assesses each employee's needs on an individual basis to determine how they may be accommodated.  (Lipinski Dep. at 37:21–38:14.)  In regards to Lipinski's own injury, he was injured in a basketball game and was granted an accommodation of two-weeks leave.  (Id. at 81:23–82:4.) Lipinski actually testified that he was not disciplined, but that his previous

supervisor, who had no involvement in Pinckney's employment, discussed with

him the importance of "protecting" himself following his injury.  (<u>Id.</u> at 82:18–22.)

Rather than establishing that the FRB had ulterior motives for firing Pinckney, this

evidence merely demonstrates that the FRB had a policy of granting its law

enforcement personnel accommodations on a case-by-case basis depending on the

particular employee's needs.

 In sum, Pinckney has failed to establish by a preponderance of the

evidence that the FRB's decision to terminate Pinckney's employment due to "job

abandonment" was mere pretext.  Accordingly, Pinckney's ADA discrimination

claim for wrongful termination fails as a matter of law.

## II. <u>Accommodation Claim</u>

 Pinckney also alleges that the FRB failed to accommodate his

disability.  Under the ADA, an employer "discriminates" against an employee if it

fails to make "reasonable accommodations to the known physical or mental

limitations of an otherwise qualified individual with a disability."  42 U.S.C.

§ 12112(b)(5)(A).

 "Because the ADA requires employers to accommodate the

limitations arising from a disability, and not the disability itself, an employee

36

seeking to assert a disability claim must produce evidence that the employer knew not only of the employee's disability, but also of the physical or mental limitations arising therefrom." Seasman v. CSPH, Inc., 179 F.3d 297, 300 (5th Cir. 1999) (citations omitted). In other words, to prove discrimination, "an employee must show that the employer knew of such employee's substantial physical or mental limitation." Taylor v. Principal Fin. Grp., 93 F.3d 155, 163 (5th Cir. 1996).

For the reasons already described above, the FRB had no reason to know that Pinckney's knee injury rose the level of a disability, let alone the particular accommodations his impairment required. The FRB was only aware that Pinckney had possibly torn his right meniscus and that Pinckney had twice informed Sanchez that he would miss work due to doctor's appointments. The FRB never received any of Pinckney's emails containing doctor's notes relating to his injury and absences; thus, it could not have known of the physical restrictions placed on Pinckney by various doctors. Additionally, Pinckney never spoke in any detail about his injury to an FRB employee. Thus, the FRB had no reason to know of any limitations imposed by Pinckney's knee injury.

Moreover, Pinckney never requested an accommodation from the FRB at the time of his injury. Although Pinckney now asserts that reasonable accommodations would have consisted of a week of leave, followed by a week of

37

light duty, he never requested these from the FRB.  "If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one."  Taylor, 93 F.3d at 165.

Citing Criado v. IBM Corp., 145 F.3d 437 (1st Cir. 1998), Pinckney contends that the events preceding his termination amounted to a "mere miscommunication" and that the FRB should have engaged in the "interactive process" with him after termination of his employment.  In Criado, the plaintiff suffered a mental disability and was granted leave by her employer, IBM, after she supplied appropriate documentation of her condition from her doctor.  Id. at 440. Her doctor subsequently determined that she needed extended leave and conveyed this information via fax to IBM.  Id.  IBM never received the doctor's fax requesting additional leave and decided to terminate the plaintiff's employment without advance notice.  Id.  The First Circuit held that, because IMB was "on notice" of Criado's disability and had already granted her an accommodation, it had a duty to continue communication with her prior to ending her employment. Id. at 444.

Here, the FRB was not "on notice" of any limitations arising from Pinckney's alleged disability, and Pinckney never made a request for accommodation prior to termination.  Pinckney only arrived back to work days

38

after the FRB had made attempts to contact him and had concluded that he

abandoned his job.  Moreover, while the SOP has a general policy that employees

can meet with a Human Resources representative to discuss any employment-

related concern, the FRB was not obligated to meet with Pinckney once he was no

longer an employee.  "[A]n employee who requests only the opportunity to return

to an unmodified, previously-held position fails to state a cognizable claim under

42 U.S.C. § 12112(b)(5)."  Burch v. Coca-Cola Co., 119 F.3d 305, 314 (5th Cir.

1997).  Such a request is merely a plea for "grace."  See id. at 319 n.14.

In sum, Pinckney cannot sustain a disability discrimination claim

under the ADA based on failure to accommodate.  The Court therefore grants the

FRB's motion insofar as it seeks judgment on that claim.

III.   Claim for COBRA Violations

COBRA requires sponsors of group health plans to provide plan

participants who lose coverage because of a "qualifying event" with the

opportunity to choose to continue health care coverage on an individual basis.

Degruise v. Sprint Corp., 279 F.3d 333, 336 (5th Cir. 2002) (citing 29 U.S.C.

§§ 1162, 1163).  A "qualifying event" includes the termination of a covered

employee's employment.  29 U.S.C. § 1163(2).  "[A]n employer has a duty to

report most qualifying events, including the termination of employment, to its

group health plan administrator within 30 days of the qualifying event.  The plan

administrator must then notify the qualified beneficiary within 14 days of being

notified of the qualifying event by the employer."  Miles-Hickman v. David

Powers Homes, Inc., 589 F. Supp. 2d 849, 878 (S.D. Tex. 2008) (citing 29 U.S.C.

§ 1166(c)).  When an employer is also the administrator of the health plan, the

employer must give detailed written notice of the availability of COBRA benefits

within 44 days after the date of the qualifying event.  Id. (citing 29 C.F.R.

§ 2590.606-4(b)).

Here, Pinckney's "qualifying event" under COBRA—i.e. the

termination of Pinckney's employment with the FRB—occurred on January 7,

2011.  On February 4, 2011, Hewitt, the health plan administrator for the FRB,

informed SHPS of this qualifying event.  On February 10, 2011, SHPS sent a

COBRA notification to Pinckney's last known address via certified mail.  Thus, the

FRB timely informed its plan administrator of the qualifying event within thirty

days and Pinckney's COBRA notification was timely sent by SHPS less than

fourteen days later.

Pinckney contends that he never received his COBRA notice.

However, the Fifth Circuit has held that employers are not "required to ensure that

plan participants actually receive [COBRA] notice," but are merely obligated to act

in good faith and to use means "reasonably calculated" to reach plan participants. Degruise, 279 F.3d at 336.  The COBRA notice requirements are satisfied when the notification is sent via certified mail.  Id. at 337.  Because the FRB has produced evidence that it timely sent Pinckney the appropriate notices via certified mail, it is entitled to judgment as a matter of law on this claim.

IV.   Motion to Strike

The FRB brings a Motion to Strike, asking that the Court remove from the record certain evidence brought by Pinckney in his Response to Defendant's Motion for Summary Judgment.  (Dkt. # 33.)  The Court has addressed the FRB's objections to various declaration statements in the "Background" section portion of this Order.  Those objections were granted in part and denied in part.  To the extent that the FRB brings other objections not addressed in this Order, they pertain to matters not material to this Court's holding on summary judgment and are denied as moot.

CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant's Motion for Summary Judgment (dkt. # 27) and **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Strike (dkt. # 31).

IT IS SO ORDERED.

DATED: San Antonio, Texas, September 30, 2013.

_____
David Alan Ezra
Senior United States District Judge